We have three cases for argument this morning. I think most of you have been here before and know the system. We have the lighting system, the green light, the amber light, and the red light. And with that, we'll call the first case, United States of America v. Bedoy. And first, we'll hear from Ms. Cowger. Good morning, Your Honor. Susan Cowger for Jose Bedoy. The clearest issue for Mr. Bedoy in this appeal is his required acquittal on count four under the binding authority of United States v. Aguilar from the Supreme Court. The bottom line is that because Judge Aguilar was acquitted by the Supreme Court on the facts in that case, Bedoy must likewise be acquitted here because there's no material distinction between these two cases. But Mr. Aguilar was a judge. We cover for judges more than we do for policemen. I'm teasing. Let me ask you with regard to that. In this case, wasn't Mr. Bedoy directly told that there was a grand jury investigation going on as opposed to the Aguilar case? Does that make a difference? Well, they were both directly told that there was a grand jury investigation going on, so there is no difference there. The agents who interviewed Judge Aguilar said there will be a grand jury hearing evidence on this, or there is a grand jury and it will hear evidence on this. So that is not a distinction. The question in Aguilar and the question here is whether Mr. Bedoy had knowledge that his statements were going to be presented to the grand jury. There was very clear testimony from the agents that interviewed him that they did not tell him that they were going to go to the grand jury, and in fact, they did not know at the time whether they were going to go to the grand jury. And that is exactly what the court in Aguilar was concerned with, that making statements to federal investigative agents who are not necessarily part and parcel of a grand jury investigation is not enough to bring a defendant within the scope of Section 1503, which is concerned solely with official proceedings like grand jury investigations, not FBI investigations. It was solely the FBI that was involved, too. He seemed incredulous about that, or perhaps he pretended to be, whatever the jury took that. But he was worried that they were FBI investigators. That does not talk about, does not contemplate a state necessarily grand jury. And he was also told a grand jury. Why is that not enough to tell him that he may be talking directly to a, that his statement will be presented to a grand jury? Because it wasn't enough in Aguilar. That's the simple answer. The same exact circumstances obtained in Aguilar that the judge knew, he knew he was talking to FBI agents, was, as you say, a federal district court judge. He has obviously some familiarity with grand jury investigations, and he subjectively believed that his statements would be passed on to the grand jury. And yet, the Supreme Court said under 1503, that is simply not sufficient evidence to convict him. If it was not a natural and probable consequence that Judge Aguilar's statements would go to the grand jury, when he believed that they would . . . Accused's act must have a relationship in time, causation, or logic with the grand jury or judicial proceedings. Yes, and the Supreme Court held that there wasn't such a nexus for Judge Aguilar. And since the factual circumstances of the cases are so similar, the court is required, I believe, to hold that the nexus does not exist here either. I think that what is sort of important about Aguilar . . . Well, Judge Aguilar believed that they were going to the grand jury, and he was acquitted. And there's no evidence that Mr. Bedoy believed his statements were going to the grand jury, at least not the same quality of evidence. I mean, there was evidence apparently in United States v. Aguilar in the trial court that Judge Aguilar, who took the stand, said he subjectively believed that the agents were going to go to the grand jury with what he had told them. And that was not sufficient to convict him. Limiting 1503 in this way is not . . . You say under Aguilar that Aguilar teaches that the government must make proof that the defendant knew, had actual subjective awareness, that the statement he was then making was in fact going to be presented to the grand jury. Yes. And so there's no . . . In your reading of Aguilar, there is no judgment of the likelihood of whatever. What do we do with the fact that in the course of an investigation, the reality is there's no purpose in conducting this matter unless it's going to a grand jury. In other words, this is not an investigation by the internal processes of the police department, the vice squad, determining whether they're doing the right thing for civil punishment or whatever it may be. But this is an FBI agent. Well, I . . . What are the uses to be made of this other than to go to a grand jury? Well, I understand that, Your Honor, and you're mostly right about that. But the fact is that not everything that FBI agents do gets to the grand jury. They may present a summary of the case. They may not present everything that . . . They certainly are not going to present everything that they have uncovered in their investigation. And what I was about to say was that limiting 1503 in this way, as the Supreme Court did, does not impinge one bit on the FBI's or the United States Attorney's ability to prosecute a false statement to an FBI agent. There's a statute made for it. But was he also told and warned that, you know, don't lie to us because . . . What else did they say? They said . . . What was the warning about not lying to us? You might be charged with obstruction if you lie to us is basically what they warned him. But, again, as an Aguilar, if the judge knew, the federal district judge knew that his . . . They told him that when there was a grand jury, he knew there was a grand jury in the picture. And he knew that he may be charged with obstruction of justice if he lied to them. Obstruction, not obstruction of justice. And they further told him that he was the target of the grand jury investigation. Isn't that right? They did. And Judge Aguilar, likewise, knew that he was the target. I believe Justice Scalia recited that there was evidence that Judge Aguilar knew he was the target. Well, in your view, what else would they need to have said in order to let him know that what he said would probably end up before a grand jury? I interpret Aguilar to mean that if you are going to, as the prosecuting authority, choose 1503 as your means of prosecuting this person, you as the FBI agent interviewing him had better tell him, I am going to the grand jury with what you tell me. I am going to the grand jury with what you tell me. So that there is no question that he knows that's what's going to happen. That's the import of Aguilar. Because the court said there that lying to an FBI agent who may or may not go to the grand jury is not sufficient for a conviction under 1503. So if you're going to use 1503, which I think is not a very smart move in the first place, but if you're going to use it, the FBI agent had better be prepared to tell the person that. And most FBI agents are not prepared to tell the person that. They don't know at that point. Just as these agents testified, they did not know whether they were going to go to the grand jury. So if that's the burden, that's not the proper statute to use. But that was the statute used here, and that's why an acquittal was required on count four. In Aguilar, Justice Rehnquist reverted back to the earlier decision of an old, impenetrable decision of the 1890s, and he quoted it approvingly. He said there we held that a, quote, person is not sufficiently charged with obstructing or impeding the due administration of justice in a court unless it appears that he knew or had noticed that justice was being administered in such court. Now, you say that . . . I agree that's what they said, but if Judge Aguilar neither knew nor had noticed and was acquitted for that reason, then the same thing holds here. It's just not possible to square the ultimate holding in Aguilar and its facts with the conviction for Mr. Bedoy. It's not intellectually honest to do it. And I recognize that it seems like an anomaly, but I think that what it boils down to is the wrong choice of statute, that 1503 is simply not a good fit for this behavior. And so based on Aguilar . . . What's the natural and probable effect of lying to them? Well, the more natural and probable consequence is getting indicted under 1001. Well, his whole purpose . . . I assume he's lying because he doesn't want to get charged with a crime. I think that's fair. The language . . . part of the difficulty . . . I appreciate your argument. It's not without a lot of foundation. But part of the difficulty I have with Justice Rehnquist's opinion here and also in the later case, of course, where Justice Rehnquist's awful with regard to Arthur Anderson is that they give us about five or six or more formulations, and they are each subject to somewhat differing readings. Because what I'm doing is just feeding back to you various statements the Court made. And they don't necessarily say that he has to have, where we started, the awareness that this is going to the grand jury. Or at least you can reach that conclusion. It's just about other formulations here. It said, Recent decisions of courts' appeals have likewise tended to place meets and bounds, etc. It said, Some are phrases showing that the act must have relationship, time, logic, and so forth. In other words, the endeavor must have the natural and probable effect of interfering with the due administration of justice. But it said, If the defendant lacks knowledge that his actions are likely to affect the judicial proceedings, he lacks the requisite intent to obstruct. If he didn't think it would be likely to have an effect on judicial proceedings, then why would he lie? Well, I'm not saying that he didn't think it would be likely to have an effect. What I am arguing, and I think the Court can appreciate this, is that if Judge Aguilar on those facts was acquitted, then there's something more than just he has to have this, you know, vague or a little bit better than vague sense that it might go to the grand jury and his lies might be presented to the grand jury. That's the only way to square Aguilar. I'll come back to Judge Gray's good question earlier. What, in your view, would have been necessary, what should have occurred or had to have occurred here in order for these statements to meet the requirement of Aguilar? The agents would have had to tell Mr. Bedoy falsely because they testified that they wouldn't have known this. They would have had to tell him that they were going to the grand jury with his statements. They would have had to tell him that. That's the only way that I can read Aguilar and make sense out of the holding and the facts. A Miranda-type warning, a compulsory type of a very precise advice that if you lie, don't lie to me because I'm taking your statement. Do a grand jury. I think that if that had been said, I wouldn't have the arguments that I have here with respect to Aguilar. But because it was not stated and because of all the things that happened with Judge Aguilar in his interview with these agents and the other things that he was found to have known and the fact that he was acquitted on all of that knowledge, the same result must hold here. Does that pre-requisite that the matter be before a grand jury? Yes, under 1503 . . . You've got a grand jury sitting. The grand jury is there. They haven't taken anything to them yet. Right. But that's not necessary that that be an ongoing matter. The grand jury has to be impaneled or there has to be a pending grand jury proceeding. And there was testimony . . . Well, you have that. There was conclusory testimony that there was. There was other testimony that indicated that maybe there wasn't yet a grand jury, but the government was not pinned down about that. And so I think that the conclusory testimony that there was a grand jury proceeding pending is sufficient under 1503, and I'm not attacking that. If I may, I just have a couple minutes. I want to talk about count three a little bit, and that is the count that the government is cross-appealing on. There is no evidence in this case that Mr. Bedoy ever told Cece to, as charged in the indictment, to get rid of her phone. The agent agreed at page 1353 of the record that he did not tell her to get rid of her phone, and he agreed that what he told her to do is change her number. That's how the district court read it. That's how the district court understood it. In finding the acquittal on count three, the district court found that he was never speaking of getting rid of the phone, but only of changing the number. The Vargas Ocampo case, which talks about the standard of review, which I fully embrace here, there are benefits of the dramatic insights gained from watching the trial. The district court had that. The district court concluded, having heard all these tapes in person during the course of the trial, that Mr. Bedoy was never talking about getting rid of the phone. Was this determination made on some constructive amendment of the indictment theory? The court did say that there was a constructive amendment of the indictment, but implicit in that . . . You agree with me that this constructive amendment of the indictment finding is likely not appropriate? It's not necessary to go there to decide this. I think if there's no evidence of what the government undertook to prove as the means of violating that statute, then there has to be an acquittal, and the judge was right to acquit Mr. Bedoy on that ground. Actually, what we're talking about is the sufficiency of the evidence argument, right? Yes. In that connection, the jury heard all the evidence with regard to what Mr. Bedoy said to Cece, and they made it . . . What you had is, you had the indictment, which the jury had, and then you had the jury charge, which tracked the language of the indictment. Isn't that right? Yes, it did. They had the indictment, they heard the evidence, and then they had a jury charge. Yes. So, your only argument then is that the evidence was insufficient to support the jury's finding that he was guilty on that case. Yes, that is correct. And I will add, if I may just have 30 seconds or less, the prosecutor argued in the case at closing, having said in opening that the testimony was going to be change your number and disappear, argued in closing that he told her to get a different phone, to change her number, but what he must have wanted her to do was get rid of the phone. There wasn't any direct evidence that he ever said that, any kind of evidence that he ever said that, and the district court, therefore, was correct to acquit him on that charge. I read Judge Lynn's comment about reference to an instructive amendment indictment simply to be a follow-on to the insufficiency of the evidence. In order for there to be evidence to support this, you're going to have to be convicting him of a different crime than the one that's charged. I mean, so it's not like the instructive amendment indictment is not off the wall. Judge Lynn. No, it's not off the wall. Well, she seldom is. Almost never. Thank you, Your Honor. Thank you. Ms. Falconer. What does Aguilar tell us? Good morning. May it please the Court. Emily Falconer for the United States. I'd like to begin just briefly by responding to a couple of comments from Mr. Bedoy's reply brief. On page three of the reply, he suggests that his conduct in this case was not, quote, real public corruption, that his conduct did not put anyone at risk, and that the government has, throughout the prosecution, relied on an overblown characterization of the badness of his acts. I would just contrast those statements with what the district court had to say about that at sentencing, which was that she had never in her career seen a case like this, that she found his conduct shocking and shameful, and that if people cannot trust the police to follow the law, then we run the risk of the very fabric of our society deteriorating. So the district court did not believe that the government had used any overblown statements of the badness of Mr. Bedoy's act. Speaking of agreement with the district court, we are, of course, largely in agreement with the district court's actions. In this case, though, we do disagree with the district court's decision to set aside the jury's verdict on count three. I have a couple of points I'd like to make about that. The first is what Your Honors had discussed with opposing counsel just moments ago, that the argument here really has been a moving target. I mean, the argument of the district court was constructive amendment of the indictment. The government proved a different theory than it charged. Now it's like, well, that's really extraneous. We don't need that, but it's a pure sufficiency issue. The evidence was sufficient to support the jury's finding that Bedoy's instruction that C.C. should change phones, he said that multiple times, get a different phone, that implicit in that was getting rid of the old phone. How was the jury charge formulated to reach this particular allegation about the phone in this count? I'm sorry, is the question? I was curious as to what the language of the charge to the jury was. The jury's face was determined, he's heard this testimony about to get rid of the phone, and the question is how does that mesh with an obstruction of justice, etc., the get rid of your cellular phone, and the jury's going to determine, does that mean destroy the phone, does that mean replace it with someone else? I take it your argument is that the jury could fairly conclude from that language that he meant to destroy the phone. Yes, Your Honor. The argument is that the jury did conclude from that language, made that inferential step, and it is a small step from get a different phone to change your phone to get a new phone. And we know, to answer your question about the jury charge, that the jury did make that step. Now the language of the jury charge was specifically, did Bedoy attempt to, or aid and abet, I can't remember exactly what that language was, conceal or destroy a material object, and did he do so to wit a cell phone, and did he do so with the corrupt purpose of telling Cece to get rid of her phone, so that, and this is also part of the charge, there would be no further evidence of the connection between them. That was the language of the jury charge. The government, in closing argument, stressed that language to the jury, specifically reiterated with the jury what exactly the tape said. The government did not run away from what Bedoy's words were in those tapes. His words were change your phone, get rid of your phone, and what the government argued to the jury, in closing argument, was that, implicit in that, he had to have meant get rid of your phone, because he's trying to, in this conversation, in the context of this conversation, he's trying to conceal everything about their relationship. The government also made the point to the jury, which we make in our brief, that Bedoy was aware, and there's evidence in the record, that Bedoy is aware that electronic devices can hold records of communications, even if the number has changed. So he's aware of that. He told Cece that he got rid of his phone. He told Cece, there was evidence in the record. Well, but you keep saying get rid of, but my best recollection is, he never actually said get rid of, did he?  I mean, if he had used that, this would be easier for you, if he had actually said get rid of. In connection with wiping phones clean, I think he told her that he gave his wife his phone, and she, and I don't remember his language, but essentially he said she got rid of all the data that was on that phone. Isn't that what he said in connection with that? He said he gave his phone to his wife, and that his wife erased the phone. All right. So he didn't say then, she got rid of the phone. That's not what he said, is it? Well, he, and our position is, in giving his phone to his wife, I mean, yes, it's still in their household, but he is no longer in possession of that phone. It's no longer his phone. He gave it to his wife. Gave it away. He got rid of it. And no, Your Honor, he did not use the magic words get rid of. And yes, I guess it would be a little bit easier if the jury charge had specifically said he attempted to destroy or conceal a material object by telling Cece to, quote, change her phone. That would be easier. But there's no requirement here that in order to find the evidence sufficient, that he must have used some magic words. I mean, the question here is, could the jury have inferred that his words meant get rid of your phone? I mean, it's a question of, and this Court has been very clear, that the jury is free to choose among competing views of the evidence. What other facts were presented to the jury that would lead the jury to interpret that statement in the way the government thinks it should be interpreted? I mean, he did not say get rid of it, but you're saying, well, that's what he meant based upon other evidence? What other evidence was there presented that would lead a jury to believe that that's what he meant? Yes, Your Honor, there are two categories of evidence that support the jury's inference there. One is, as I mentioned to Judge Graves, the evidence about his awareness and her awareness of the fact that the devices do carry a footprint. They carry a footprint of communications, even when the number has been changed. And there was actually testimony that Cece had previously had a cell phone. This was actually elicited, this evidence was elicited by Mr. Bedoy's own attorneys, that Cece had previously had a BlackBerry that she did not turn over to the FBI. Even though she had a new number, those text messages could not be reached by the FBI because she had lost that physical device. So it's clearly in her mind, it's in his mind. The jury's also allowed to just use their common sense and think that as a veteran police detective, he would certainly be aware of . . . What's the language of the indictment with regard to the destruction of the cellular phone? In this count, what's the language of the indictment? The language in the indictment is the same as what was charged in it. The language in the indictment is identical to the jury charge. The indictment charged that he acted corruptly to impede an official proceeding by telling Cece to get rid of her cell phone in order to . . . This language is also in the indictment and the charge, and I think that's important. . . . but told her to get rid of her cell phone in order to destroy evidence of the connection between them. Why does it matter whether it was to destroy the phone or to strip it of data? Well, I mean, it only matters to the extent . . . I'm having a little difficulty understanding what else this can mean to get rid of your phone. The question for the jury is whether or not this conduct was obstruction of justice, that they were destroying evidence. Get rid of your cell phone, whether it be to physically throw it away, throw it in the lake, or whether it's to get rid of the data or whatever else. It means something to . . . I guess that's what I'm having trouble with. We're framing this on appeal as this narrow language, and I'm curious as to what the jury . . . the question before the jury really was. The jury wasn't asked what did he just . . . did he mean by that to destroy the phone physically? That wasn't the . . . the jury may have read it to me that to get rid of your cell phone, put it . . . make sure that there's nothing on that phone that's going to provide evidence of what the message is, however colloquially expressed it is. I don't know if you follow my line of thinking here, but . . . I think I do, Your Honor. I think . . . so is the question did the jury actually in fact have to find that he specifically told her to get rid of the phone? I think that's a fair question, especially in light of the Supreme Court's recent decision in Masaccio. In Masaccio, the Supreme Court held . . . this was just a couple of months ago . . . The Supreme Court held that even if the government undertakes in a jury charge to prove something more than what is required by the elements of the charge on a sufficiency review . . . what the court looks at is did the government prove the elements of the crime? And so under Masaccio, Your Honor, I absolutely agree. It's possible that the government did not even have the burden to prove that he said to get rid of the phone. I mean, I think that certainly we have met that burden, but it is absolutely possible that that burden . . . the government did not even have that burden. That all that we have to look at on sufficiency review was did he tell her . . . did he attempt to destroy or conceal this phone? Whether it's by wiping it clean, by changing it, by getting a new number. And under Masaccio, it's highly possible that no, that's all that the jury had to find. Are you telling me you misstated the elements then in the indictment? I'm looking at the indictment right now. I'm assuming this is correct. And I don't want to read it all, but you said witness in the investigation. This is the last line. Witness in the investigation to get rid of her cellular telephone so that there is no connection between person A and Bedoy. That's what the indictment says. Yes, that is what the indictment says. But it's not strictly an element of the crime, if I understand Judge Higginbottom's point. It's not strictly an element of the crime. So it's a possible argument. It's not our main argument that under Masaccio that all we would have to look at on sufficiency review is whether the evidence of the elements of the crime as laid out by this Court in the case law, as laid out by the statute, is what we'd have to look at. Was there an act of destroying or concealing a cell phone, whether by telling her to get rid of it, whether by telling her to get a new number, whether by telling her to erase it? It's certainly possible for the Court to conclude that that's all that's required under Masaccio. Now, Masaccio did leave open the question, to your point, Judge Graves, of what happens if the government undertakes an additional element in the jury, in the indictment itself, if I understand your point. And the Supreme Court did leave that question open. So we would certainly think that under Masaccio's rationale, which was simply that sufficiency review is really just about were the core, bare minimum elements of due process met? Did he have fair notice of what the charge was against him? I mean, could he not defend the charge against him if, you know, if what was in the indictment was saying something along the lines of getting rid of the phone, but actually maybe only told her to get a different phone? I mean, did he not know what he was defending against there? That's really what the Supreme Court is concerned about in Masaccio, and I would suggest that if that is the main concern of Masaccio, that the correct next step for Masaccio is that we would only look at the elements, even if the indictment includes that extra piece. But that's not what Masaccio said. But then my problem is the purpose of the indictment is to put a defendant on notice about what the charge is against him. And so if the government takes on the burden of establishing, according to this indictment, that he instructed her to get rid of her cellular phone, then as a defendant, shouldn't you reasonably expect that that's what the government intends to prove? And this whole issue has to do with whether or not he actually instructed her to get rid of the phone, which is that's the language in the indictment, get rid of her phone. I mean, that may be the case, Your Honor. We haven't run away from the burden of proving get rid of the phone. We believe the jury reasonably inferred. We, in closing argument, asked the jury to find that. We told them what the actual language that he used was. We told them what inferential step they needed to make. The jury made that inference, and the question is was that a reasonable inference from, I mean, putting aside the question of whether we had to prove what was in the indictment or what misogyny means, the court may not even reach that difficult legal question because the jury did, in fact, find that he told her to get rid of a phone. And we know that the jury sent a question to the court saying, what specific phone are we talking about? So we know that that wasn't inference the jury made. Do we have any testimony from C.C. as to how she interpreted this comment to change your phone? Did she testify as to what she thought that meant? We do, Your Honor. I'm sorry I don't have a specific record site for that off the top of my head, but we do. C.C. did, the government did ask C.C. on direct examination what she understood him to mean. You know, actually I do. It's 965 to 971 is this line of questioning in the record. And the government asks, you know, plays this tape where he's saying change your phone, different phone, and says, you know, what did you understand this to mean? And she said, I understood he was telling me to get rid of my phone, to get rid of it. That's what she understood him to say because he was trying to disappear any connection between them. Can I move you over to talk about the count two and the 1512 C.2 of the statute itself? As you're aware, we have a 2-2 circuit split over whether it is corrupt to encourage a potential witness to exercise their right or privilege not to provide information to the government. What is your argument in that regard here? They argue that simply building off Arthur Anderson that there's nothing inherently corrupt in telling a person that you have a right not to testify or you don't have to tell these people anything, don't cooperate, etc. Yes, Your Honor. I mean, our position here is that this court should adopt what is the majority view in this circuit split, which is that it can be corrupt persuasion to encourage a witness not to testify, to encourage a witness to exercise their constitutional rights. Now, Bedoya set up somewhat of a strawman argument here. The government has never said that it's inherently corrupt to advise someone on their constitutional rights. But it's all a question of context. And the courts that have found that this is a permissible cause of action, that's the 11th Circuit, the 2nd Circuit, the 9th Circuit, that really what's crucial is the context in which that statement is being made. That is how we evaluate whether or not the instruction not to talk to the police or not to testify was corrupt under the Arthur Anderson standard. Here, the context absolutely supports the jury's inference that, in fact, he was telling her that was a corrupt purpose, that it wasn't an innocent instruction to exercise your constitutional rights. Just moments before that, they had been talking about one of the tips he gave her. He told her, you know, hey, I'm looking into this Studio Serene massage studio, but I didn't know you worked there. And they had this whole conversation, this back and forth. And she said, well, yes, you did. You told me you weren't going to investigate it because I worked there. And he said, well, no one knows that. You don't have to tell anyone that. And then literally in the next breath, they have this exchange in which he says, you don't have to tell anyone anything. She says, do I have to talk to the FBI? You have a Fifth Amendment right not to respond to any of these questions. People have talked to you. You have a right not to talk to them. And you have your Fifth Amendment privilege. I suppose the officer had told him that. Bedoy had told her sissy that. Certainly, that's true. He's basically telling her, you don't have to cooperate. You don't have to do this thing. She does. She does have that. I mean, she does have that. We don't deny that it would have been her right to refuse to talk to the FBI, to refuse to cooperate. The point, only point. Justice Randolph's opinion talks about the first one, not quite apt here, of a mother telling her son not to cooperate. He talks about somebody who invoked a husband and urging his wife not to invoke a marital privilege. All that being acceptable conduct that is in view of this statute. And she had a Fifth Amendment right to close the door and not let those officers in, to tell them I'm not talking to you. And the officer just told her she had that right. Yes. Arthur Anderson does talk about those, does use those two examples. But what the court's referring to in Arthur Anderson is those two examples, standing alone. And the court talks about, in that same footnote, the importance of sussing out the difference between wholly innocent conduct, advising someone of their rights, and conduct that is done for a corrupt purpose. And the standard in Arthur Anderson was, on this issue, was whether the defendant made this advice with consciousness of wrongdoing. And the question there, under Arthur Anderson, under all of the courts that have looked at this, is the context in which it gets said. What else is he saying along with this advice? A mother can tell her son, you know, don't test, don't, you know, you should plead the Fifth. You know, you can encourage someone to use, invoke the spousal privilege. But if it's being done in a context, for instance, in the Eleventh Circuit case shots, he's advising a witness not to testify, and also raising the specter at the same time, hey, you could be prosecuted, too. You could be on the hook for this, too. And that allowed the Seventh Circuit to infer corrupt motive in giving that advice. We have the same thing happening here with Bedoy and Cici. He's telling her, you could get deported. On the expansive wing of that split, the Ninth Circuit concluded that split by saying intimidation, bribing, or other misconduct. If the advice to invoke your rights is accompanied by either of those three things, then you're out of bounds. My question is, this is a police officer, and he is in the vice unit, and his responsibility is to investigate vice. Why isn't any suggestion to avoid prosecution fall within that Ninth Circuit provision of that misconduct of a police officer? Is that the kind of misconduct we're talking about? If it is, I'm not sure what exactly that qualifying language means. I don't think, I mean, Mr. Bedoy made that distinction in his reply brief. I don't think that the cases support the view that in order to have liability here, there has to be some specific underlying crime or misconduct. But I would also, as I mentioned at the beginning of my argument, really take exception with the idea that what's going on, the underlying conduct here, him exchanging in a quid pro quo, we have him on tape saying, you owe me, I gave you tips, you owe me sexual favors, that that conduct would not rise to the level of seriousness of underlying conduct that would make this advice corrupt. I mean, like we see in the Ninth Circuit case, we see in Gotti, the Second Circuit case, there is underlying misconduct, but there certainly is so, too, here. Well, I suggest that perhaps the distinction may be that it's one thing to sell something and invoke their privilege not to testify, but the suggestion would be that, well, maybe that doesn't, it's corruptly done, and if that has the effect of suppressing evidence against me urging that, the difficulty with that, which sounds logical, but the difficulty with that is that that's exactly what happens with my encouraging my wife to invoke a marital privilege and not talk about what I've done, because that's my whole purpose is that's to avoid prosecution, and she has a right not to do so. I mean, he'd have an obligation if he had not been involved with this woman, if he had just conducted an investigation when he went in to start to interrogate her to give her Miranda rights. It would warn her that she didn't have to talk, you don't have to talk to me, you don't have to say anything, and you don't have to talk to any other officer. Well, I mean, the spousal privilege, I think, is perhaps maybe a little bit of an anomalous situation, because in some jurisdictions it's an absolute privilege, in some jurisdictions a spouse cannot even testify against a spouse. Here, he and Cece are not married, he's just advising her about her, ostensibly advising her about her constitutional rights, and yet, in order to avoid that evidence being taken against him, but it goes beyond saying don't talk to the police. I mean, he's coaching her in the same conversation on if you talk to somebody, here's what you should say. Did you know me? Yes, you should say you knew me, but I didn't give you any information. I mean, he's rehearsing for her what she should say to the authorities of question in a way that clearly lies. So I just think it's difficult to justify the conclusion that it could never be obstruction for him to tell her not to talk to police. I mean, that's a pretty extreme view, it is the view that the Third Circuit has taken, that this can never be obstruction of justice, but the majority view appears to be that in some instances it can, when you have the right context, the jury can make the inference that that was done with the requisite correct motive from Arthur Anderson. And I think I would urge this panel to adopt that same view. Thank you, Ms. Falconer. Ms. Koger? Thank you. I want to tick off a few responses here. First of all, if I heard Ms. Falconer correctly, she cited to pages 969 to 971 of the record, and I just looked at those and I don't see anything there about C.C. saying, I thought he was telling me to get rid of my phone. I'm sorry, you're speaking too rapidly for me. I'm sorry, Your Honor. Let me say it again. I understood Ms. Falconer to refer to two or three pages in the record on the question of whether C.C. understood Mr. Bedoy to be telling her to get rid of her phone, and I looked at those pages, if I heard her correctly, and I did not see anything about that topic there. Off the top of my head, I do not remember anybody ever using the words get rid of with respect to that phone in the course of this trial. I'm not going to swear to it. It's a long trial. But I don't think it's there. Also, I don't think it's important what she understood him to mean. The indictment, as Your Honor has pointed out, alleges that he told her to get rid of her phone. It doesn't say he meant for her to get rid of her phone when he told her something else, and that's what the prosecution argued. With respect to the Musacchio case, as Ms. Falconer said, it's correct that the Supreme Court expressed no opinion about what happens when the government takes on a particular burden in the indictment and it's reflected in the jury charge. But that leaves in place this Court's existing authority that says under those circumstances, the government has to prove what it took on to prove. It's in the indictment. It's in the jury charge. The government has a burden to prove it, and if the government fails to prove it, it's insufficient evidence. And those are the main reasons why the count three acquittal should stand. That sounds like a lot of the strange law of the case doctrine that crept in, and I thought we had managed to escape that.  It's an erroneous law of the case about proof that the government is requiring all this proof, and we ultimately said, no, what you have to prove is what they ultimately—regardless of that, we're going to judge the sufficiency of the evidence for the elements of the case, not by the erroneous— My research indicated that the cases the Court decided, cited in my brief, Jopel and Taylor among them, are that if the government charges it and it's echoed in the jury charge, then that's the government's burden. And that's what happened here. Also, I want to point out that with the government charged in the case, there are four alternative ways of violating that particular subsection. You can alter, destroy, mutilate, or conceal the object. The government only chose to charge destroy or conceal. It did not charge alter or mutilate. Changing your phone or changing your phone number would be altering the object, but the government didn't charge that, and that's a specific sub means of violating the statute. Counsel, I don't want to overstate, but I may be prepared to conclude that they took on the burden of proving that he advised her to get rid of the phone when they indicted that way, and you just pointed out how narrow the indictment is, what alternatives they could have employed. But why isn't it a reasonable inference? They had taped conversations of him talking to Sissy or Cece, I'm not sure which, of him talking to her and giving her advice. Why couldn't the jury reasonably infer from what he said to her that what he meant was get rid of the phone? Why wasn't that a reasonable inference? Well, because there's really a big difference between changing your phone number or getting a different phone and getting rid of the old phone. One does not necessarily lead to the other. And I also want to point out, this may be considered kind of minimal in importance, but it's not true that Mr. Bedoy gave his phone to his wife. What he testified to was that she took it from him because she was mad as hell at him, and she didn't want him to have his phone anymore and the contacts that were in it. So she's the one who took his phone and erased it or whatever she did to it. So then we could just be arguing about what it means to get rid of a phone. Yeah, what does it mean to get rid of a phone? And I think if you're talking about the jury applying its common sense, get rid of means it's not findable, it's not around anymore, get rid of it. It doesn't mean change the number. It doesn't mean put it over there and get a different phone. And the district court found specifically that there was no evidence that he told her to get rid of the phone. But he didn't have to use those exact words. I mean, if we look at all the evidence in the case . . . The indictment charged that he did use those words. What's that? The indictment charged that he told her to get rid of the phone. Right, to get rid of the phone, but it didn't say he had to use those exact words in telling her to get rid of the phone. He used the words get a new phone or change phones or whatever. Get a different phone, change your phone, change your number. Let me ask . . . I'm sorry. Go ahead. On my time that you're out of yours, one quick question. I'm a county director at Count Two. Yes, sir. Where the government alleged that Bedoy told Sissy to, quote, not let anyone into her apartment, talk to her, including agents at the FBI. And the government charges that's a violation of 1512C2. Yep. And we know that there's a split and the interpretation of that, et cetera. The Ninth Circuit wing of that being the most defendant-oriented. But my question is, even under the Third and Ninth Circuit's viewpoint, which say that it's not inherently maligned or corrupt to encourage a witness to exercise their privilege not to provide evidence to others, why aren't you up beyond the reach of even that most favorable line of cases? When we're dealing with a police officer, who his motivation here is protecting himself from criminal prosecution, and more than that, disclosure of his misconduct as a police officer and accepting sex in exchange, inviting her, giving her, tipping off where the raids are going to be, et cetera, a fundamental or dishonorable response that a police officer can make. Why doesn't that, in and of itself, take you beyond those cases? Well, I have two things to respond. One is that you have to remember still that this is a charge of obstructing a grand jury proceeding, an official proceeding, a federal grand jury proceeding. And so you have to draw the inference that he's telling her these things in order to keep her from the grand jury. And the second part of my response is that it's really important to look at the context of their conversation, and not only the part of the context that Ms. Falconer referred to, but the context that C.C. kept nagging him. What about the FBI? Can they come in? And he says, no, they can't come in. Even they can't come in. And you don't have to open the door to them. And this is what the government charges. That is a perfectly. . . He goes on. He goes on and says. . . And he gives her suggestions about the fact that they had sex together and said, you know, who knows that? You know, I didn't. . . And he says, of course, I. . . And he denies to her what he knows is false. That's no. . . A juror could reasonably read that. It's lessened. Nobody knows that we had sex except the two of us. Keep your mouth shut. I mean, that's. . . That's true. He doesn't want her to talk to the FBI. I'm sure he doesn't want her to talk to the FBI, but he has to not want her to go to a grand jury. Given his responsibilities, his obligations as a police officer, why isn't that, in and of itself, put you beyond the reach of both the Third and Ninth Circuit's viewpoint? Interpretation 1512. Well, let me talk about the Ninth Circuit case. In that case, there was the additional fact that that defendant was tampering with another witness, aside from asking his wife not to talk. And that would normally be a circumstance that a court would take into account as context that would say this man corruptly doesn't want people to talk because. . . This man, he's tampering with this witness, and then he's also telling his wife, please don't talk to them. I think that kind of context is an issue. You know, if it's not enough there, then I rely on that kind of rationale. The Ninth Circuit. How does such a simplified pattern create so many legal problems? Your Honors, I appreciate the opportunity to argue and would ask that the three convictions be reversed and the acquittal stand. Thank you. Thank you. Ms. Calgary, your court appointee, is that correct?